James L. Bromley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————x
In re                                              :       Chapter 11
                                                   :
Kumtor Gold Company CJSC and Kumtor Operating      :       Case No. 21-11051 (LGB)
Company CJSC,[1]                                    :
                                                   :       (Joint Administration Pending)
                                                   :
                              Debtors.             :
———————————————————————x

**DECLARATION OF DANIEL DESJARDINS IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

        Daniel Desjardins, being duly sworn, states the following under penalty of

perjury:

        1.       I am an authorized representative of Kumtor Gold Company ("KGC"), a Closed

Joint Stock Company founded in accordance with the laws of the Kyrgyz Republic (the

"Republic") and Kumtor Operating Company ("KOC"), a Closed Joint Stock Company founded

in accordance with the laws of the Republic (each, a "Debtor," and collectively, the "Debtors").[2]

I served as President of each of the Debtors from January 20, 2015 through January 1, 2020,

during which time I was based in Bishkek, the largest city in and capital of the Kyrgyz Republic.

I also serve as a Director of each of the Debtors and I have served as a Director since February 1,

---

[1]    The Debtors' corporate headquarters is located at 24 Ibraimova Street, 720001, Bishkek, the Kyrgyz Republic.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant
       First Day Motion (as defined herein).

2020.  Since January, 2020, I have served as Chief Operating Officer of Centerra Gold Inc.

("Centerra").  I have over 30 years of experience in the international mining industry, including

working in the Republic, the United States, Canada, Australia, Indonesia and several African

countries.  I have a Master's degree in Business Administration and a Master of Science degree

from Curtin University of Technology in Perth, Australia, and a Bachelor of Commerce degree

from Mount Allison University in Sackville, New Brunswick, Canada.  I am a registered CPA in

the Province of Ontario.

2.      As a result of my longstanding roles with the Debtors and especially my five

years living in the Republic, I am generally familiar with the Debtors' day-to-day operations,

financial affairs, business affairs and books and records.  Except as otherwise indicated, all facts

set forth in this declaration (the "Declaration") are based upon my personal knowledge, my

review of relevant documents, or my opinion based upon my experience, knowledge, and

information concerning the Debtors' operations and financial affairs.  I am over the age of 18.  I

am a Canadian citizen and a resident of Ontario.  I am authorized to submit this Declaration on

behalf of each of the Debtors.  If called upon to testify, I would testify to the facts set forth

herein.

3.      On May 31, 2021 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors are debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  As a result of the illegal Expropriation Event (as defined below), the Debtors

have been prohibited from exercising day-to-day operational control of the mining facilities

located in the Republic.

4.      In connection with the commencement of these Chapter 11 Cases, the Debtors have requested relief in certain "First Day" motions (collectively, the "First Day Motions").

5.      I submit this Declaration in support of the First Day Motions.  I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought (a) is necessary to preserve the value of the Debtors' operations and assets, (b) is integral to the successful restructuring of the Debtors and (c) serves the best interest of the Debtors' estates, their creditors, their shareholder and other parties-in-interest.

## PART I

### I.      Overview of the Debtors' Businesses

6.      Each of the Debtors is a Closed Joint Stock Company founded in accordance with the laws of the Republic, with their headquarters located in Bishkek, the Kyrgyz Republic.  The principal business of the Debtors is to operate and develop the Kumtor gold mine (the "Kumtor Mine"), a high-altitude open pit mine located almost 4000 meters (or 13,000 feet) above sea level.  Open pit mining has been conducted at the Kumtor Mine since 1996.  Kumtor is one of the largest gold mines operated in Central Asia by a Western-based company, having produced more than 13.2 million ounces of gold between 1997 and the end of 2020.

7.      KOC was previously the operator of the Kumtor Mine.  KOC's operational functions transitioned to KGC almost a decade ago.  Although KOC now has minimal activity, it remains party to certain agreements related to the operation of the mine.  KGC is currently the sole owner and operator of the Kumtor Mine.

8.      Each of the Debtors is 100% owned by Centerra, a gold mining company incorporated pursuant to the Canada Business Corporations Act.  Centerra's common shares are publicly listed on the Toronto Stock Exchange under the symbol "CG," as well as on the New York Stock Exchange under the symbol "CGAU."

9.      The sole commercial output of the Kumtor Mine is gold doré, which is partially refined gold.  All gold doré produced by the Debtors at the Kumtor Mine is purchased by Kyrgyzaltyn JSC ("Kyrgyzaltyn"), a state-owned corporation incorporated under the laws of, and wholly owned and controlled by, the government of the Kyrgyz Republic (the "Government").  Title to the gold doré passes to Kyrgyzaltyn at the Kumtor Mine.  Kyrgyzaltyn operates a gold refining monopoly in the Republic and purchases the gold doré from the Debtors for refining and sale outside the Republic.  These purchases take place pursuant to the Restated Gold and Silver Sale Agreement dated June 6, 2009 entered into among KOC on behalf of KGC, Kyrgyzaltyn and the Government (the "Offtake Agreement").  The Offtake Agreement provides that all proceeds from gold sales payable to KGC are to be deposited in US Dollars in KGC's New York bank account (the "New York Account").  The Debtors have maintained the New York Account since 2008.

10.     Kyrgyzaltyn owns approximately 26.2% of Centerra's issued and outstanding common shares and is Centerra's largest shareholder.  Pursuant to the Restated Shareholders Agreement dated June 6, 2009 (the "Shareholders Agreement") and described in more detail below, Kyrgyzaltyn was given the right to designate two persons to be nominated for election as directors of Centerra so long as it holds at least 10% of Centerra's common shares.  Given the Expropriation Event and related circumstances, which are described in more detail below, the Shareholders Agreement bars Kyrgyzaltyn, and any of its affiliates, from transferring or encumbering or exercising any voting rights attached to their Centerra shares, receiving any dividends or distributions which can be attributed reasonably to KGC or its assets or operations, or exercising dissent rights in respect of their Centerra shares.

11.    Since its inception, the Kumtor Mine has been operated by the Debtors with the approval of the Government.  Such approval has included, among other things, approval of the structure and management of the Kumtor Mine's environmental operations.

12.    Since commencing open pit mining in 1996 and commercial operations in 1997, more than $3.4 billion has been invested in the Kumtor Mine.  As a result of that investment, the mine has generated important revenues for the Government.  Through 2020, the Kumtor Mine has been profitable, generating over $1.4 billion for the Republic in the form of taxes, customs and other duties.  These amounts are in addition to the equity returns earned by Kyrgyzaltyn over the lifespan of the Kumtor Mine.

II.    **Historical Relationship between the Debtors and the Kyrgyz Republic**

A.    Original Agreement (1992)

13.    The gold deposits in the area that would become the Kumtor Mine were first discovered by authorities of the Union of Soviet Socialist Republics (the "USSR") during explorations that took place during the period from 1979 to 1989.  This exercise culminated in an initial reserve statement issued by the USSR State Committee on Reserves in 1990.  During this period, the Republic was part of the USSR and was known as the Kirghiz Soviet Socialist Republic.  Following the democratic reforms in the USSR during the leadership of Mikhail Gorbachev, the Republic declared independence from the USSR on August 31, 1991.  Thereafter, the Government entered into negotiations with a number of non-Kyrgyz developers with respect to what eventually became the Kumtor Mine.

14.    The Debtors' business relationship with the Government began in 1992 when Cameco Corporation ("Cameco"), through its wholly owned subsidiary, Cameco Gold Inc. ("Cameco Gold"), entered into a project development agreement (the "Original Project Agreement") with the Government, giving Cameco Gold the exclusive right to evaluate and

develop the Kumtor Mine.  In connection with the Original Project Agreement, Cameco formed

KGC, which became the corporate entity through which the evaluation and development of the

Kumtor Mine would take place.  The Original Project Agreement was negotiated and signed in

New York, New York and was governed by New York law.

15.    Between 1992 and 1997, KGC, funded by Cameco and utilizing Cameco's

experience, expertise and a cash investment of approximately $452 million, developed the

Kumtor Mine for commercial operation.  At the time mining operations commenced in 1997,

Cameco and Kyrgyzaltyn owned direct interests in the project through their ownership of KGC.

B.    First Restructuring (2003)

16.    In or around 2002, Cameco and Kyrgyzaltyn entered into discussions to

restructure their respective interests in the Kumtor Mine.  These negotiations continued

throughout 2003 and culminated in a series of amended agreements relating to the ongoing

operation and development of the Kumtor Mine, ultimately resulting in the establishment by

Cameco of Centerra, most of the shares of which were distributed to Cameco's shareholders in a

spin-off transaction, and the restructuring of Kyrgyzaltyn's ownership of the Kumtor Mine.

Specifically, pursuant to the terms of the amended agreements, Cameco and Kyrgyzaltyn (on

behalf of the Government) agreed to transfer their direct interests in KGC to Centerra in

exchange for common shares in Centerra, with Kyrgyzaltyn receiving 33.33% of Centerra's

common shares and other consideration and Centerra owning 100% of KGC (the "First

Restructuring").  In addition, Kyrgyzaltyn sold 7.5 million of its common shares in Centerra's

initial public offering, receiving proceeds of approximately CAD 116.25 million.  Following

consummation of the First Restructuring, Kyrgyzaltyn (and the Government) no longer held a

direct ownership interest in KGC, the Kyrgyz entity that owns the Kumtor Mine, but rather held

16.1%. of the common stock of Centerra, the publicly traded owner of KGC.  This provided

Kyrgyzaltyn (and the Government) much greater liquidity for its investment in the Kumtor Mine.

      C.    <u>Second Restructuring (2007)</u>

      17.    Despite the agreed terms of the First Restructuring, in the first quarter of 2007,

following the overthrow of the former president of the Republic in 2005, the Republic's

Parliament (the "<u>Parliament</u>"), began to consider draft legislation that, among other things,

(a) challenged the legal validity of the Debtors' and Centerra's agreements with the Government

governing the Kumtor Mine, (b) proposed imposing additional taxes on amounts relating to past

activities at the Kumtor Mine, and (c) provided for the transfer of gold deposits (including those

at the Kumtor Mine) to a Kyrgyz state-owned entity.  This legislation was not adopted, but

provided the backdrop for a second restructuring of the ownership of the Kumtor Mine.

      18.    KGC and Centerra negotiated and ultimately entered into a new agreement with

the Government on August 30, 2007, revising the terms of the First Restructuring that had taken

place only a few years earlier (the "<u>Second Restructuring</u>").  KGC, Centerra and the Government

submitted their revised agreement to the Parliament for parliamentary approval in early

September 2007; however, while the Parliament began to deliberate as to whether to approve the

agreement, the then-President of the Republic Kurmanbek Bakiyev, who was publicly in support

of nationalizing the Kumtor Mine, dismissed Parliament.  The revised agreement was not

approved by the Government.  KGC, Centerra and the Government never operated under the

terms of the Second Restructuring.

      D.    <u>Third Restructuring (2009)</u>

      19.    The following year, in 2008, the Vice Speaker of the Parliament brought claims

against KGC and Centerra in Kyrgyz courts to invalidate the decrees, agreements and licenses

that permitted the operation of the Kumtor Mine.  KGC and Centerra were actively involved in

both international arbitration against the Government and in defending such litigation.  Again, KGC and Centerra entered into negotiations with the Government to resolve the outstanding issues between them.  These negotiations culminated in KGC, KOC, Centerra, the Government, Kyrgyzaltyn and Cameco, entering into a series of agreements (the "2009 Agreements" or the "Third Restructuring"), including an Agreement on New Terms (governed by New York law), the Shareholders Agreement, the Offtake Agreement and the Restated Investment Agreement (governed by New York law), dated June 6, 2009, between Centerra, the Government, KGC and KOC (the "RIA").  Among other things, the 2009 Agreements expanded Centerra's concession area, provided for a simplified tax regime applicable to the Kumtor Mine, and stabilized all Kyrgyz laws applicable to the mine. The 2009 Agreements were approved by the Parliament, signed by the then-Prime Minister of the Republic and approved by Kyrgyz courts, and the Ministry of Justice of the Republic issued a favorable legal opinion on the validity and enforceability of the 2009 Agreements.  The Parliament also passed a new law that affirmed the supremacy of the 2009 Agreements in the event of any conflict between such agreements and the law of the Republic.  Pursuant to the terms of this restructuring, Centerra issued approximately 18 million common shares to Kyrgyzaltyn, Cameco agreed to transfer 25,300,000 common shares to Kyrgyzaltyn and the Government agreed to dismiss all claims against Centerra and the Debtors related to the Kumtor Mine.

20.     On December 30, 2009, Cameco disposed of its entire interest in Centerra through a secondary public offering and the transfer of 25,300,000 common shares to Kyrgyzaltyn. Upon the completion of these transactions, Kyrgyzaltyn owned 33% of Centerra's outstanding common shares.  After certain unrelated issuances of Centerra shares, as of December 31, 2020, Kyrgyzaltyn owned 26.2% of Centerra's outstanding common shares.

E.     Fourth Restructuring (2017–2019)

21.     In April 2010, as a result of upheaval in the Kyrgyz Republic, the Republic's

government transitioned to new leadership.  Two years later, in June 2012, the new Parliament

issued a resolution requiring a review of the operations at the Kumtor Mine with a purported

focus on its compliance with operational, environmental, health and safety, and community

standards.

22.     In the fall of 2012, Sadyr Japarov (the current President of the Republic) was an

active participant in a mass protest against the Kumtor Mine and attempted to storm the then-

President's office in the Republic.  Mr. Japarov was charged under Article 295 of the Criminal

Code of the Republic with an offence in respect of the "[f]orcible seizure of power or forcible

retention of power."  Mr. Japarov was found guilty in March 2013 by a court in Bishkek, the

Kyrgyz Republic and was sentenced to an 18 month sentence in prison.  However, shortly

thereafter, in June 2013, a separate Bishkek court vacated Mr. Japarov's sentence and acquitted

him of all charges.

23.     In the years that followed, the Government took a number of steps that Centerra

viewed as further attempts to pressure Centerra into making concessions to the Government.

These included:

         a.   In 2014, the Government had an INTERPOL Red Notice (an international

              arrest warrant) issued for the arrest of Leonard Homeniuk, Centerra's

              former Chief Executive Officer, for alleged 'involvement in corruption' as

              a result of his involvement in the process of entering into the 2009

              Agreements.  No evidence was ever put forward to substantiate that

              allegation, and Centerra publicly denied any wrongdoing by Mr.

              Homeniuk.  Mr. Homeniuk described the charges as an attempt to pressure

Centerra into signing a new revenue-sharing deal with the Government in respect of the Kumtor Mine. Due to the Red Notice, Mr. Homeniuk was arrested in Bulgaria on July 27, 2015 and detained for several months, until a Bulgarian court determined that the Government did not produce adequate evidence to justify Mr. Homeniuk's extradition to the Republic.

b. In 2014, the Government also commenced criminal cases against certain of KGC's managers, alleging that the managers had somehow deprived the Kumtor Mine of assets or had caused unspecified damage to the Republic. The Government additionally restrained certain KGC managers from leaving the Republic, and from conducting certain financial transactions.

c. In 2016, the Kyrgyz regulatory authorities commenced claims in Kyrgyz domestic courts against KGC and KOC, alleging environmental damages in breach of Republic laws, particularly in connection with the Kumtor Mine's historical practice of storing production tails on glaciers located at the Kumtor Mine – a practice which had been repeatedly approved by Kyrgyz regulators. In May 2016, a Kyrgyz court issued multiple orders against KGC and KOC, including final orders purporting to award $102 million to the Government, as well as an interim order requiring KGC to pay approximately $217 million to the Government and prohibiting KGC from transferring property or assets, declaring or paying dividends, pledging assets or making loans.

24.     The Government's allegations and claims had no merit.  The Debtors and

Centerra maintained then, and continue to maintain, that the Kumtor Mine has operated in

material compliance with all laws and regulations under the Republic and in accordance with the

2009 Agreements.  The Defendants and their affiliates at that time sought all proper relief under

Kyrgyz law and initiated arbitration proceedings under the 2009 Agreements' arbitration

provisions.

25.     Once again, the parties ultimately resolved their issues by executing the Strategic

Agreement on Environmental Protection and Investment Promotion dated September 11, 2017,

and fully effective as of August 26, 2019 (the "2017 Agreement" or the "Fourth Restructuring").

The 2017 Agreement was signed by the then-Prime Minister of the Republic. The 2017

Agreement provided the Debtors and Centerra with full releases and resolution of all existing

arbitral and environmental claims, disputes, proceedings and court orders.  The Government

agreed, on behalf of itself and of any person or entity entitled to make a claim in the name of the

Republic, "never to bring any action, directly or indirectly . . . on the subject matter of" any of

the existing claims, including in respect of KGC's historical and Government-approved practice

of storing production tails on glaciers.  The Government also agreed to "support" the companies

and to "uphold the terms" of the 2017 Agreement "in any action brought by any Government

Entity or third party acting or purporting to act on behalf of" the Republic relating to those

claims.  The orders restricting KGC's financial activity and the free movement of KGC's

employees were also lifted.  The 2017 Agreement was implemented over the course of

approximately two years through a series of milestones that were completed in August 2019.  At

that time, the Government represented that neither the Government, nor any person with the

ability to bring claims in the name of the Government, had any actual, pending or threatened claim against the Debtors.

26.      As part of implementing the 2017 Agreement, KGC fulfilled a series of recommendations made by the Government's own third-party environmental consultant, Amec Foster Wheeler, which the Government engaged to assess the Kumtor Mine's disposal of material on glaciers and other mine operational practices at the time.  In addition, in the 2017 Agreement, KGC agreed to make a $60 million lump sum payment, as well as millions more in annual payments, to Government-controlled funds above what was otherwise owed pursuant to the 2009 Agreements.

F.      Corruption in the Kyrgyz Republic

27.      The climate for international investment in the Republic has been historically difficult.  The main drivers of these difficulties have been, and continue to be, political instability and corruption.  As the U.S. Department of State reported in its "2020 Investment Climate Statement" for the Republic: "Corruption continues to be a major constraint to business development, particularly in the state customs and border agencies … [t]he country's judicial system is not fully independent and susceptible to external political influence.  While the legal and regulatory framework is set up to be in accordance with international norms, poor implementation and weak enforcement … is an endemic problem."[3]

G.      The 2020 Election Protests and Current Government of the Republic

28.      In 2017, the current President of the Republic, Sadyr Japarov, was convicted of attempted kidnapping and the hostage-taking of another Kyrgyz official during protests against

---

[3]    U.S. Department of State. (2020). *2020 Investment Climate Statements: Kyrgyz Republic.*
       https://www.state.gov/reports/2020-investment-climate-statements/kyrgyz-republic/ (last visited June 4, 2021).

the Kumtor Mine that occurred in 2013 (the "2013 Kidnapping Incident").  Mr. Japarov was

sentenced to 11.5 years in prison and began to serve his sentence in that year.

29.     In October 2020, the Republic held parliamentary elections.  Violent protests

followed the results of those elections.  In the wake of those protests, Sadyr Japarov saw his

conviction overturned and, within days, Mr. Japarov was appointed interim President of the

Republic following the forced resignation of his predecessor.  Mr. Japarov was later elected

President of the Republic in new elections held in January 2021 and, following a referendum, has

significantly expanded the powers of the presidency in the first half of this year.

III.    **Events Leading to the Chapter 11 Filing**

A.      Events Related to the Illegal Expropriation of the Kumtor Mine

30.     Following the election of Sadyr Japarov as President, the Government began to

take measures that have been characterized in part by the Canadian and U.K. governments as

involving the "probable nationalization" of KGC.[4]  In March 2021, four citizens of the Republic,

including the son of the director of the State Agency for Environment Protection and Forestry,

filed a lawsuit on behalf of the Republic in Kyrgyz court seeking financial sanctions against

KGC for alleged environmental damage.  In particular, the lawsuit alleges illegal dumping of

production tails on glaciers prior to 2019 – a claim that was asserted prior to and clearly released

under the 2017 Agreement (an agreement that was fully implemented in 2019).  I understand

from reviewing the Kyrgyz court's rulings in the case that, contrary to the 2017 Agreement, the

Government actively supported this claim.

---

[4]      Embassy of Canada to the Kyrgyz Republic. (2021). *Joint Statement on Recent Developments in the Kyrgyz Mining Sector*. https://www.international.gc.ca/country_news-pays_nouvelles/2021-05-13-kyrgyz_republic-republique_kirghize.aspx?lang=eng (last visited June 4, 2021).

31.    On May 3, 2021, the claimants amended their complaint to add a claim for KGS

(Kyrgyz som) 261,719,674,080 (approximately $3,087,000,000) to be payable to the Republic.

This amount was apparently provided to claimants by representatives of the Government.  KGC

was provided no time to prepare a defense.  The Kyrgyz court dismissed all of KGC's objections

as to process and substance out of hand at perfunctory hearings on May 4 and May 6, 2021 and

then rendered judgment on May 7, 2021 for the entire sum sought with all amounts to be paid not

to the plaintiffs but to the Republic the ("May 7 Judgment").  KGC had planned on appealing the

May 7 Judgment prior to the Government's seizure of the Kumtor Mine on May 17, 2021,

discussed further below.  The deadline for appealing the May 7 Judgment is June 6, 2021.

32.    The 2009 Agreements that govern the Kumtor Mine contain a specific tax and

fiscal regime applicable to the Kumtor Mine.  That tax and fiscal regime provides, among other

things, that no taxes are payable by KGC on intercompany transactions with Centerra, including

dividends, and contains particular provisions on payroll deductions.  Nevertheless, in the first

quarter of 2021, the Republic's State Tax Service began asserting claims for purported unpaid

taxes against KGC in violation of the 2009 Agreements.  These claims included:  (i) a claim for

approximately $106 million related to withholding taxes on dividends paid to its direct parent

company, Centerra, during the years 2016 and 2017; and (ii) a claim for approximately $17

million related to payroll deductions not withheld by KGC on certain national employee

compensation from the years 2016 through 2017.  Each of these claims was initially raised by the

State Tax Service in 2018 but was subsequently withdrawn or terminated pursuant to decisions

of the State Tax Service in March 2018.  The State Tax Service annulled its previous decision in

order to revive such claims.  The State Tax Service also made a claim against KGC for

approximately $23 million in relation to payments to the Kyrgyz Republic Social Fund from the

years 2011 through 2017.  This claim was made in direct contradiction to the conclusions of the

State Tax Service itself from previous years, which conclusions confirmed that KGC had no

outstanding Social Fund payments.  The amounts of each of those claims included significant

purported penalties and/or sanctions assessed by the State Tax Service, in some cases more than

half of the total amount claimed.  Government officials have stated publicly that they believe the

tax claims will amount to more than $1 billion.  The Debtors vehemently deny any such tax

claims.

33.     In parallel to these developments, in February 2021 the Parliament formed a new

State Commission tasked with reviewing "the effectiveness of the Kumtor Mine's activities."

KGC cooperated with the State Commission's inquiries consistent with KGC's investment

agreements.

34.     In April 2021, new legislation was proposed by the head of the State Commission,

Akylbek Japarov, before the Parliament that would amend Kyrgyz laws that implemented the

2009 Agreements by deleting sections of those laws that recognized the primacy of the RIA over

other Kyrgyz legislation, in clear violation of the 2009 Agreements.

35.     In light of these developments, on April 26, 2021, the Debtors and Centerra sent a

notice of dispute to the Government as provided for under the terms of the 2009 Agreements,

informing the Government that the Government's actions violated or threatened to violate the

2009 Agreements and the 2017 Agreement and offering to negotiate the disputes.  The

Government did not respond to that notice in any way.

36.     On April 30, 2021, Akylbek Japarov, on behalf of the State Commission,

introduced further legislation before the Parliament that would allow the Government to assume

management authority over KGC (the "Temporary Management Law").  The Temporary

Management Law was quickly passed on May 6, 2021 (just the day before the entry of the May 7 Judgment), after three readings in a single day, and was signed into law by Mr. Japarov on May 14, 2021. Although the legislation is drafted in general terms, during the short parliamentary debates, it was acknowledged that the only operation to which it applied was the Kumtor Mine.

37.     The Temporary Management Law purports to permit the Government's mineral resources agency to suspend KGC's "right to use subsoil resources on the grounds of violation by the company of" Kyrgyz law that "creat[es] an immediate threat to the life or health of people working or living in the zone of operations influence, as well as failure by the company to undertake the necessary measures to eliminate" that threat. The Temporary Management Law also permits the President, upon such suspension, to unilaterally prohibit KGC's management from making decisions relating to its operations, business management, commercial and financial activities, and to take control of KGC's assets by introducing temporary external administration with full control over all of KGC's assets, including its bank accounts. Upon appointment of an external manager, KGC's shareholders and directors have "no right to interfere in the current management of the company by giving direct instructions, orders or any other instructions in the form of a request or recommendation to the temporary external manager." Individuals who violate the Temporary Management Law can be subjected to criminal punishment and imprisonment.

38.     On May 14, 2021, in accordance with their express contractual rights, the Debtors and Centerra initiated binding arbitration seeking injunctive relief against the Government based on its violations and threatened violations of the 2009 Agreements and 2017 Agreement.[5] In

---

[5]     The formal notice of arbitration was delivered to the Government on May 18, 2021 in accordance with the agreements.

accordance with its disclosure obligations, Centerra issued a press release regarding its commencement of arbitration proceedings on May 16, 2021.  Under those agreements, the arbitration is seated in Stockholm, Sweden and will proceed under the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL").  The arbitrator has not yet been appointed.  Notwithstanding the commencement of arbitration, the Government did not cease its efforts to seize the Kumtor Mine.

39.     On the morning of May 15, 2021, the homes of senior managers of KGC in the Republic were visited by persons purporting to be law enforcement officials.  The manager's computers and passwords were seized and they were then taken to KGC's office in Bishkek where a search of the office was carried out and significant documents and, perhaps, additional computers were seized.  One or more of KGC's IT personnel reportedly were taken from their homes and brought to the Kumtor Mine.  Kyrgyz authorities concurrently installed their officials at the Kumtor Mine without providing KGC with any advance warning.

40.     On May 17, 2021, after it had already taken steps to seize the Kumtor Mine on May 15, 2021, the Government purported to implement the Temporary Management Law, despite there being no violations of Kyrgyz law creating any imminent threat to anyone. Government agents had effectively seized full operational control of KGC and the Kumtor Mine by May 17 (the "Expropriation Event") in blatant violation of the parties' contractual rights and obligations.  A former Kyrgyzaltyn-nominated Centerra board member and Kyrgyz national, Tengiz Bolturuk, was named as the temporary manager.

41.     As a result of the Government invoking the Temporary Management Law, the Debtors' duly appointed management may face criminal prosecution in the Republic for attempting to direct the operations of the Kumtor Mine following the Expropriation Event.

42.     The Government purported to implement the Temporary Management Law in response to supposed efforts by Centerra and/or KGC to shut down safety, monitoring or operational systems at the Kumtor Mine.  This allegation is false.  In response to the Government's efforts to seize the Kumtor Mine over May 15–17, 2021 in violation of the 2009 Agreements, Centerra restricted access by local KGC employees to Centerra's global IT systems in order to protect those systems from unauthorized intrusions.  However, all key safety, monitoring and operational systems at the Kumtor Mine were functioning properly before the Government took control of the Kumtor Mine.  The Debtors did not disable any such systems, and the Kumtor Mine was operating without incident when Government agents seized it.

43.     Although the Debtors strongly contest the validity of the Temporary Management Law, that law itself provides for the appointment of temporary external management for KGC only in the event that KGC's mineral rights are suspended.  The Debtors are not aware of any purported suspension of KGC's mineral rights.  To the contrary, on May 21, 2021, the Government issued a press release in English indicating that "the mine has been restored to full operations" and that the Government-appointed management team, including Mr. Bolturuk, has "[r]esumed production of gold at the site."  I am not aware that the operations at the Kumtor Mine were ever suspended or ceased.

44.     On May 26, 2021, on an application by Centerra, the Ontario Superior Court of Justice issued a preliminary injunction against Mr. Bolturuk based on breaches of his fiduciary and confidentiality duties owed to Centerra as a former Centerra board member, prohibiting Mr. Bolturuk from having any involvement, directly or indirectly, with the management, operation or control of the Kumtor Mine pending a further order of the court.  Centerra's application returned before the Ontario court on June 4, 2021, and the preliminary injunction remains in effect.

Based on news reports and a press release from the Government-installed temporary management of KGC, Mr. Bolturuk has continued to act as the temporary manager despite the Canadian court's preliminary injunction.

45.     The Government's efforts to fully expropriate the Kumtor Mine appear to be ongoing.  According to public statements made by Government officials during a May 17, 2021 session of the Parliament as well as news reports, the Government intends to use the environmental and tax claims (described above) as a pretext to place KGC into an insolvency proceeding in the Republic and to strip KGC of its assets, including the Kumtor Mine.

B.     Events Related to Kyrgyzaltyn's Attempted Fraud

46.     While the Government was taking action to effectively nationalize the Kumtor Mine and just days before the Government's seizure of the mine, Kyrgyzaltyn took steps to defraud KGC by attempting to divert approximately $29 million in gold sale proceeds without authorization, presumably to fund the operation of the Kumtor Mine in the event of its expropriation.  On May 7, 2021, the Debtors and Kyrgyzaltyn jointly signed and sealed a standard payment order addressed to StoneX Financial Inc. ("StoneX"), Kyrgyzaltyn's sole gold off-taker, directing payment of approximately $29 million for gold to be delivered by Kyrgyzaltyn.  The form of this payment order is governed by the Offtake Agreement.  Under the Offtake Agreement, the Government, Kyrgyzaltyn and KOC on behalf of KGC agreed that all proceeds from gold sales payable to KGC would be deposited in US Dollars in the New York Account.  That account has not changed since the Offtake Agreement was entered into in 2009, and has been used to receive payment orders in consideration for gold shipments since the Offtake Agreement's effectiveness.

47.     On May 12, 2021, Kyrgyzaltyn, using a forged payment order, attempted to direct StoneX to deposit proceeds of sales pursuant to the May 7 payment order to a different bank account in New York without the authorization of the Debtors or any of their affiliates.  The Debtors became aware of this attempt only when StoneX contacted the Debtors to confirm the change to the long-standing payment instructions.  To date, the Debtors have not received payment on their May 7 payment order, and to the Debtors' knowledge, Kyrgyzaltyn has not delivered the related shipment of gold, in violation of the Offtake Agreement.

C.      New Purported Criminal Investigations

48.     Since the Kumtor Mine seizure, according to news reports the Government has once again opened criminal investigations relating to the Kumtor Mine.  Based on those reports, the Government has arrested several former Government officials associated with the 2009 Agreements, alleging some unspecified corruption related to the mine.  Those investigations appear to be part of an effort to undermine the 2009 Agreements, even though the agreements were heavily negotiated and approved by the Parliament, Prime Minister of the Republic, and the Ministry of Justice of the Republic.

IV.    **Summary of Assets and Liabilities**

A.      Assets

49.     As of April 30, 2021, the Debtors held assets totaling approximately $1.14 billion in book value and held approximately $79.0 million in cash.  However, following the Expropriation Event and the Debtors' loss of control of the Kumtor Mine and its related facilities, the Debtors do not currently control any of their physical assets or a majority of their cash.

B.    Liabilities

50.    As of April 30, 2021, the Debtors had liabilities totaling approximately $147.5

million in book value, consisting of an approximately $56.5 million provision for site restoration

relating to the Kumtor Mine, approximately $2.5 million of loans and borrowings and

approximately $88.5 million in accounts payable.  Before the Expropriation Event and the

Debtors' loss of control of the Kumtor Mine and its related facilities, the Debtors had no funded

indebtedness and have not granted security interests in any of their assets to secure any

indebtedness.

## PART II

51.    The Debtors have filed a number of administrative First Day Motions.  The

Debtors believe, and I agree, that approval of each First Day Motion is an important element of

their reorganization efforts and is necessary to ensure a smooth transition into and out of chapter

11 with minimal disruption to their operations.  I have reviewed each of the First Day Motions or

had their contents explained to me, including the exhibits thereto.  Factual information with

respect to each First Day Motion is provided below and additional detail is contained in each

First Day Motion.  Capitalized terms, to the extent not defined herein, have the meanings

provided in the respective First Day Motions.

A.    Debtors' Motion for Entry of an Order (I) Directing Joint Administration of
Chapter 11 Cases and (II) Waiving Requirements of Section 342(c)(1) of the
Bankruptcy Code and Bankruptcy Rules 1005 and 2002(n) (the "Joint
Administration Motion")

52.    These Chapter 11 Cases involve more than one Debtor.  In the Joint

Administration Motion, the Debtors are requesting entry of an order directing the joint

administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes

only.  Given the integrated nature of the Debtors' operations, I believe joint administration of

these Chapter 11 Cases will provide administrative convenience without harming the substantive rights of any party-in-interest.

53.     I believe joint administration of these Chapter 11 Cases will promote efficiency and will ease the administrative burden on the Court and all parties-in-interest.  Because the Debtors' financial affairs and business operations are closely related, many of the motions, hearings and orders in these Chapter 11 Cases will affect both Debtors.  Accordingly, I understand that joint administration will reduce the volume of paper that otherwise would be filed with the office of the Clerk of the Bankruptcy Court, reduce costs associated with various administrative tasks and minimize the number of unnecessary delays.  Moreover, the joint administration of these Chapter 11 Cases will simplify supervision of these Chapter 11 Cases by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee").  Accordingly, the Debtors believe, and I agree, that joint administration of these Chapter 11 Cases is in the best interest of the Debtors' respective estates, creditors and all other parties-in-interest.

B.     <u>Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenses, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedules Extension Motion")</u>

54.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the time to file schedules of assets and liabilities, schedules of current income and expenses, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 20 days, for a total of 34 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions or waivers.

55.     The Debtors are not currently in day to day operational control of their business and do not have complete access to books and records that contain the information necessary to prepare the Schedules and Statements.  The Debtors are requesting this extension to permit additional time to assemble and assess such available information.  The Debtors do not believe that the requested extension will harm creditors or other parties-in-interest because the Debtors will still be required to file the Schedules and Statements in advance of any deadline for filing proofs of claim in these Chapter 11 Cases.

56.     For these reasons, I believe that the entry of an order approving the Schedules Extension Motion is in the best interests of the Debtors' respective estates, creditors and all other parties-in-interest.

C.     <u>Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' Top 30 Creditors and (II) Establishing Procedures for Notifying Parties of Commencement of These Chapter 11 Cases (the "Creditor Matrix Motion")</u>

57.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) maintain a consolidated list of creditors (the "<u>Creditor Matrix</u>") in lieu of submitting a separate matrix for each Debtor and (ii) file a consolidated list of the Debtors' top 30 unsecured creditors (the "<u>Top 30 Creditor List</u>") and (b) establishing procedures for notifying parties of the commencement of these Chapter 11 Cases.

58.     I am advised that debtors are usually required to file a list containing the names and addresses of each creditor and a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders.  Although these lists of creditors are usually filed on a debtor-by-debtor basis, in a chapter 11 bankruptcy case involving more than one debtor, the debtors may maintain, in lieu of filing, a consolidated list of creditors and file a consolidated list of the debtors' top creditors.  Here, the preparation of a separate list of

creditors for each Debtor would require more time and there would be substantial overlap.

Additionally, converting the Debtors' computerized information to a format compatible with the

matrix requirements would be a burdensome task and would greatly increase the risk of error

with respect to information on computer systems maintained by the Debtors or their agents.

Further, because a large number of creditors may be shared among the Debtors, the Debtors

request authority to file a single, consolidated list of the 30 largest creditors. This will help

alleviate administrative burdens, costs and the possibility of duplicative service.

59.    The Debtors additionally request that the Court establish procedures for mailing

notices to creditors, including the Notice of Commencement of these Chapter 11 Cases. The

Debtors propose that Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto") undertake

all mailings directed by the Court or the U.S. Trustee or as required by the Bankruptcy Code,

including the Notice of Commencement, and serve the Notice of Commencement by regular mail

to creditors in accordance with Bankruptcy Rule 2002. The Debtors also propose to publish the

Notice of Commencement on the website maintained by Stretto at

https://cases.stretto.com/kumtorgold in order to provide sufficient notice to persons who did not

otherwise receive notice by mail. The Debtors believe, and I agree, that the proposed procedures

provide adequate notice to the Debtors' creditors. For these reasons, I believe that the relief

requested in the Creditor Matrix Motion is appropriate under the circumstances.

D.    <u>Debtors' Application Seeking Entry of an Order (I) Authorizing and Approving
       the Appointment of Stretto as Claims and Noticing Agent and (II) Granting
       Related Relief (the "Claims Agent Application")</u>

60.    I understand that this Court is authorized to utilize agents and facilities other than

the Clerk for the administration of bankruptcy cases. I believe that if Bankruptcy Management

Solutions d/b/a Stretto ("Stretto") is retained as the claims and noticing agent in these Chapter 11

Cases, the distribution of notices and the processing of claims will be expedited and the Clerk

will be relieved of the administrative burden of processing what may be an overwhelming

number of claims.

61.     I have also reviewed Stretto's Engagement Agreement, which is attached as

Exhibit C to the Claims Agent Application, and the description of services that Stretto has agreed

to provide and the compensation and other terms of the engagement as provided in its

Engagement Agreement.  Based on that review, I believe that the Debtors' estates, creditors,

parties-in-interest and the Court will benefit from Stretto's experience and cost-effective

methods.  Prior to retaining Stretto, the Debtors solicited, and reviewed, engagement proposals

from two other potential claims and noticing agents.  The Debtors believe, and I agree, that

Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise,

and that the appointment of Stretto as claims and noticing agent is the most effective and

efficient manner by which to provide noticing and claims processing services in the Chapter 11

Cases and is necessary and in the best interests of the estates.

    E.    Debtors' Motion for Entry of an Order Enforcing Sections 362, 365(e)(1) and 525
          of the Bankruptcy Code (the "Automatic Stay Motion")

62.     Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order

enforcing and restating the global automatic stay, *ipso facto* and antidiscrimination provisions

under the Bankruptcy Code and directing all applicable courts of competent jurisdiction to take

all appropriate measures to enforce and recognize these Chapter 11 Cases, including, but not

limited to, application of the automatic stay and all other orders entered in these Chapter 11

Cases in the relevant jurisdiction.

63.     I understand that, as a result of the Debtors' business operations, the Debtors have

many foreign creditors, contract counterparties and other parties-in-interest in countries who may

not be well versed in the protections and restrictions of the Bankruptcy Code.  I also understand

that some of these creditors and parties-in-interests do not transact business on a regular basis

with companies that have filed for chapter 11.  These creditors and parties-in-interests may be

unfamiliar with the operation of the global automatic stay and other provisions of the Bankruptcy

Code.  Accordingly, the Debtors submit, and I agree, that such circumstances warrant an order

apprising parties—especially non-U.S. governmental units, creditors and vendors—of sections

362, 365(e)(1) and 525 of the Bankruptcy Code and the protections provided thereby.

**PART III**

I.    **Information Required by Local Bankruptcy Rule 1007-2**

64.    Local Rule 1007-2 requires certain information related to the Debtors, which I

have provided in the exhibits attached hereto as Exhibits A through M.

- <u>Exhibit A</u> attached hereto provides the Debtors' current corporate structure chart.

- Pursuant to Local Rule 1007-2(a)(3), <u>Exhibit B</u> attached hereto provides, to the best of the Debtors' knowledge and belief, the names and addresses of the members of, and attorneys of, any committee organized prior to the Petition Date.

- Pursuant to Local Rule 1007-2(a)(4), <u>Exhibit C</u> attached hereto provides, to the best of the Debtors' knowledge and belief, the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address) and telephone number (provided that the names, addresses and telephone numbers of current and former employees have been redacted); the name(s) of person(s) familiar with the Debtors' accounts; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.  In each case, the claim amounts listed on <u>Exhibit C</u> are estimated and subject to verification.  In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

- Pursuant to Local Rule 1007-2(a)(5), <u>Exhibit D</u> attached hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name, address (including the number, street, apartment, or suite number and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim;

an estimate of the value of the collateral securing the claim; and whether the claim or lien is disputed.  In each case, the claim amounts listed on Exhibit D are estimated and subject to verification.  In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

- Pursuant to Local Rule 1007-2(a)(6), <u>Exhibit E</u> attached hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(7), <u>Exhibit F</u> attached hereto provides information on the Debtors' outstanding publicly held securities, listing separately those held by each of the debtors' officers and directors and the amounts so held.

- Pursuant to Local Rule 1007-2(a)(8), <u>Exhibit G</u> attached hereto provides the following information with respect to any property of the Debtors in possession of or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Rule 1007-2(a)(9), <u>Exhibit H</u> attached hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business as of the Petition Date.

- Pursuant to Local Rule 1007-2(a)(10), <u>Exhibit I</u> attached hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(l1), <u>Exhibit J</u> attached hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), <u>Exhibit K</u> attached hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), <u>Exhibit L</u> attached hereto provides the estimated amount of weekly payroll to the Debtors' Employees (not including officers, directors and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Rule 1007-2(b)(3), <u>Exhibit M</u> attached hereto provides a schedule for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: June 4, 2021
New York, New York

Respectfully submitted,

*/s/ Daniel Desjardins*
Daniel Desjardins

**Exhibit A**

Corporate Structure Chart



## **Exhibit B**

Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the following committees have been formed prior to the Petition Date.

None.

## Exhibit C

Consolidated List of 30 Largest Unsecured Creditors (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), to the best of the Debtors' knowledge and belief, the following table sets forth the information of each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders.  The Debtors do not currently have access to their internal financial systems following the seizure of their operations on May 15, 2021. This table therefore reflects unsecured creditors with the largest outstanding claims as of such date, which outstanding amounts likely have changed and are undetermined as of the Petition Date.

| # | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date |
|---|---|---|---|---|---|
| 1. | Machinery Intertrade Limited<br><br>Alliance House 12 Caxton Street London, Great Britain | Bulent Atar<br>batar@borusan.com<br>Mobile number: +7 701 951 9869 | Trade Debts | | Undetermined |
| 2. | CENTRAL TREASURY OF THE MINISTRY OF FINANCE OF KYRGYZ REPUBLIC<br><br>Erkindik boulevard 58, 720040, Bishkek, Kyrgyzstan | Public reception:<br><br>e-mail: minfin@minfin.kg<br>Tel: +996 (312) 66-12-27 ext.3812 | Gross Proceeds Tax | | Undetermined[1] |
| 3. | IP Consult (International) Ltd<br><br>Portland House, Glacis Road, GX11 1AA, Gibraltar | Stephane Kieffer<br>s.kieffer@ciseg.eu<br>+33 620 61 01 54 | Trade Debts | | Undetermined |
| 4. | Vzryvprom Technology Ltd.<br><br>BLD 34, KARBYSHEVA STR, KOSTANAY, KAZAKHSTAN | ROMANENKO ALEXANDER<br>romanenko_a72@mail.ru<br>+7 778 742 97 97 | Trade Debts | | Undetermined |
| 5. | YSYK-KOL Resource Ltd<br><br>32 Janetov St., Tilekmat V, Jeti-Oguz Region, Issyk- | Askhad K. Seitkaziev<br>ASKHAD.SEITKAZIEV76@MAIL.RU<br>+7 705008334 | Trade Debts | | Undetermined |

---

[1] Amounts subject to set-off for amounts owed to Debtors pursuant to Restated Investment Agreement, dated as of June 6, 2009.

| # | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date |
|---|---|---|---|---|---|
| | Kul Obl, Kyrgyz Republic | | | | |
| 6. | Sandvik Mining and Construction<br><br>KAZAKHSTAN, ALMATY, 42 TIMIRYAZEV STREET, EXHIBITION HALL NO. 10, BLOCK C. 7 FLOOR | VOROZHTSOV Bunakova@sandvik.com +7 727 292 70 61 | Trade Debts | | Undetermined |
| 7. | Eurasian Machinery LLP<br><br>KAZAKHSTAN, ALMATY CITY, N. NAZARBAEV AVENUE, 277/66 | KASSENOV B. +7 701 208 14 91<br><br>Kemal Cetinelli kcetinelli@eurasiancm.com<br><br>Sergey GREKHOV +7 701 2284822 s.grekhov@eurasiancm.com | Trade Debts | | Undetermined |
| 8. | Maxam Kazakhstan LLP<br><br>40, 4th Floor, Republic Avenue, Karaganda, Republic of Kazakhtstan. | Alexey Chernov (+7) 701 705 61 64 chernov@maxam.net<br><br>Aliya Makhmutova amakhmutova@maxam.net (+7) 721 2320458 | Trade Debts | | Undetermined |
| 9. | Drilling Company Stalker Ltd<br><br>2 Cholpon-Atinskaya St., Bishkek, Kyrgyz Republic | Norvin V.V. +996 555771548 prospecting_ltd@mail.ru | Trade Debts | | Undetermined |
| 10. | Liebherr Export AG – Spare Parts<br><br>GENERAL-GUISANSTRASSE 14, NUSSBAUMEN AG, SWITZERLAND | Steiner Sandra Sandra.Steiner@liebherr.com +41 56 2961111 | Trade Debts | | Undetermined |
| 11. | Agrostroy PT LLC<br><br>ROOM #10A, 43 ZHILUNOVICH STREET,  MINSK, BELARUS | ANDREY BEKRENEV agrostroy@tut.by +37 517 2072036 | Trade Debts | | Undetermined |

| # | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date |
|---|---|---|---|---|---|
| 12. | CENTRAL TREASURY OF THE MINISTRY OF FINANCE OF KYRGYZ REPUBLIC<br><br>Erkindik boulevard 58, 720040, Bishkek, Kyrgyzstan | Public reception:<br><br>e-mail: minfin@minfin.kg<br>Tel: +996 (312) 66-12-27 ext.3812 | Issyk-Jul Development Fund | | Undetermined[2] |
| 13. | Rimex Supply Ltd.<br><br>9726 186TH STREET, SURREY BC, CANADA | ZAHRA NERVAL<br>zahra.nerval@rimex.com<br>+1 604 8880025 | Trade Debts | | Undetermined |
| 14. | Cummins LLC<br><br>KLYAZMA, 1G, KHIMKI MOSCOW REGION, RUSSIA | ANDREI STEPANOV<br>mc864@cummins.com<br>+7 495 9268624 | Trade Debts | | Undetermined |
| 15. | SDL UGO Ltd.<br><br>184 AHUNBAEVA ST., APT 413, BISHKEK, KYRGYZ REPUBLIC | B.CHUKIN<br>bchukin@yandex.com<br>rchukin@mail.ru<br>+996 550 344424 | Trade Debts | | Undetermined |
| 16. | Stewart Assay and Environmental<br><br>2 KALININA ST., KARA-BALTA, JAYYL REG., CHUY OBL., KYRGYZ REPUBLIC | SALAMAT IMANAKUNOV, LABORATORY<br>stewart-karabalta@ktnet.kg<br>+ 996 3133 61925 | Trade Debts | | Undetermined |
| 17. | Maptek Ltd.<br><br>3 DARNAWAY STREET, EDINBURGH, UNITED KINGDOM | Stephen Cowley<br>accounts@maptek.com<br>+44 13 12258447 | Trade Debts | | Undetermined |
| 18. | Usubaliev Kylychbek<br><br>V Verh-Atbashi, Stroitelnaya 3, Kyrgyz Republic | Usubaliev Kylychbek Sadygalievic<br>+996 550970128<br>chpusubaliev@mail.ru | Trade Debts | | Undetermined |

<hr>

[2]  Amounts subject to set-off for amounts owed to Debtors pursuant to Restated Investment Agreement, dated as of June 6, 2009.

| # | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date |
|---|---|---|---|---|---|
| 19. | Goldenman Petroleum Equipment Co.<br><br>RM 712, Wandaguoji Park, No 67 Fuquan str. Dongying, China | Edilbek Esenbekov<br>015@goldenman.cn<br>+86 15601626937 | Trade Debts | | Undetermined |
| 20. | Specpricep Company LLC<br><br>PROEZD MELIORATOROV, HOUSE 38, TVER CITY, RUSSIAN FEDERATION | VOLKOVA NATALIA<br>tvercompania@specpricep.ru<br>+74822744503 | Trade Debts | | Undetermined |
| 21. | Algol DV LLC Euro<br><br>2ND AMBULATORNIY PASSWAY, 10, 2ND FLOOR, UNIT 207, MOSCOW, Russian Federation | Ivan Loboiko<br>loboiko.i@tsc.su<br>+79858586432 | Trade Debts | | Undetermined |
| 22. | Transityre BV Michelin Export FA Eikdong 5 PO Box 6578, 4802 HN Breda, Netherlands | Isma Bouhaddouf<br>isma.bouhaddouf@michelin.com<br>+33473304087<br><br>Boivka Vitaliy<br>+7 968 534 27 87<br>vitaly.boivka@michelin.com | Trade Debts | | Undetermined |
| 23. | SPC Vulcan Inc<br><br>17 Akademika Artsimovicha str., rm IV, office 10, Moscow, Russian Federation | Oleg Razinkov<br>info@vulcan-inc.ru<br>+7 (495) 585-9733 | Trade Debts | | Undetermined |
| 24. | GTH Tehnodom Germaniya LLP<br><br>ROZYBAKIEVA STREET 125/1 AP 4, ALMATY, KAZAKHSTAN | v.prokopenko@outlook.com | Trade Debts | | Undetermined |
| 25. | Kemira OYJ<br><br>PORKKALANKATU 3, PO BOX 330, HELSINKI, FINLAND . | TUOMO KESKINEN<br>tuomo.keskinen@kemira.com<br>+358 10 86 11 | Trade Debts | | Undetermined |

| # | Name of creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank, loan, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date |
|---|---|---|---|---|---|
| 26. | Esco Belgium S.A.<br><br>ZONING INDUSTRIAL, RUE DES FOURS A CHAUX, FRAMERIES BELGIUM | SVETLANA TITOVA<br>Svetlana.Titova@escocorp.com<br>+32 65 611563 | Trade Debts | | Undetermined |
| 27. | Epiroc Central Asia LLP<br><br>14, Iliyas Zhansugiruly, Astana, Kazakhstan | Roman Uteshev<br>roman.uteshev@epiroc.com<br>+77770086195 | Trade Debts | | Undetermined |
| 28. | Sanatori Avrora UD PKR<br><br>S.BULAN-SORGOTTU, ISSYK-KUL REG,. ISSYK-KUL OBL, KYRGYZ REPUBLIC | AKIBAEV A.A.<br>aurora.kgz@gmail.com | Trade Debts | | Undetermined |
| 29. | Sanatorium Kyrgyzskoe Vzmorye<br><br>CHOLPON-ATA, BOSTERI , KYRGYZ REPUBLIC | NAMAZOVA ALIYA KADYRBEKOVNA<br>profcomkgk@mail.ru<br>+996 77081-18-89 | Trade Debts | | Undetermined |
| 30. | R.C. Moffatt Supply Limited<br><br>725 MACKENZIE AVE, EAST PO BOX 13, ATIKOKAN ONT P0T 1C0, CANADA | Emily Kingston<br>salesdm@moffattsupply.com<br>+1 780 4351921 | Trade Debts | | Undetermined |

**<u>Exhibit D</u>**

Holders of the Five Largest Secured Claims Against the Debtors on a Consolidated Basis

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the Debtors are not aware of any secured claims against the Debtors.

**Exhibit E**

Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the below is a summary of the Debtors' assets and liabilities as of April 30, 2021. The amounts reflected below were derived by totaling the indicated amounts reflected in each Debtor's books and records. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

| As of April 30, 2021 | |
| --- | --- |
| (United States Dollars) | |
| **Assets** | |
| Property, plant and equipment, net | 614,668,029 |
| Reclamation trust fund | 52,918,190 |
| Prepayments for non-current assets | 11,882,240 |
| Total non-current assets | 679,468,459 |
| Inventories | 194,146,922 |
| Supplies | 162,335,846 |
| Loan to parent company | 54,522,900 |
| Trade and other receivables | 33,565,179 |
| Cash and cash equivalents | 17,104,524 |
| Total current assets | 461,675,372 |
| **TOTAL ASSETS** | 1,141,143,831 |
| | |
| **LIABILITIES** | |
| Loans and borrowings | 2,563,665 |
| Provision for site restoration | 56,450,862 |
| Noncurrent liabilities | 59,014,527 |
| Trade and other payables | 88,511,827 |
| Current liabilities | 88,511,827 |
| Total liabilities | 147,526,355 |
| **EQUITY** | 993,617,476 |
| **TOTAL LIABILITIES AND EQUITY** | 1,141,143,831 |

## **Exhibit F**

The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, the Debtors have no publicly traded stock, debentures, or securities.

## **Exhibit G**

Debtors' Property Not in the Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.  The Debtors are working to confirm that no other such party is in possession of any of the Debtors' property and reserve the right to supplement this exhibit if additional property is identified.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

| Property | Entity Holding Property |
|---|---|
| Expropriated Assets | As a result of the Expropriation Event, the Debtors have been prohibited from exercising day-to-day operational control of the mining facilities located in the Kyrgyzstan Republic. |

**Exhibit H**

Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other an arrangement from which the Debtors operate their businesses as of the Petition Date.

| Debtor/ Lessee | Address | Type of Interest |
|---|---|---|
| Kumtor Gold Company | 24 Ibraimova Street, 72001, Bishkek, Kyrgyz Republic | Lease |
| Kumtor Gold Company | Garage attached to Uchkun office address 24 Ibraimova Street, 72001, Bishkek, Kyrgyz Republic. | Lease |
| Kumtor Gold Company | Warehouse 300M2, 24 Ibraimova Street, 72001, Bishkek, Kyrgyz Republic. | Lease |
| Kumtor Gold Company | Radujnaya 9, Bishkek, Kyrgyz Republic | Lease |
| Kumtor Gold Company | 9 Naryn Highway Balykchy Marshalling Yard Balykchy, 721900, Kyrgyzstan | Lease |
| Kumtor Gold Company | Kumtor Mine Site, located in the Kyrgyz Republic, approximately 350 kilometers to the southeast of the Kyrgyz capital of Bishkek and about 60 km to the north of the international boundary with the People's Republic of China, in the Tien Shan Mountains, at 41° 52' N and 78° 11' E. | Held pursuant to the Restated Concession Agreement among the Government of the Kyrgyz Republic on behalf of the Kyrgyz Republic and Kumtor Gold Company CJSC, dated as of June 6, 2009. |

## **Exhibit I**

Location of the Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

Location and Nature of Debtors' Substantial Assets:

- As of April 30, 2021, the Debtors have assets of more than $1.14 billion as provided in Exhibit E, with substantial assets in the Kyrgyz Republic.

Books and Records:

- The Debtors maintain their books and records on an information technology system. The system and a majority of physical records are operated and maintained from the following Debtor' offices:
  1. Uchkun Office, 24 Ibraimova Street, 72001, Bishkek, Kyrgyz Republic.

  2. Balykchy Marshalling Yard, 9 Naryn Highway Balykchy Marshalling Yard Balykchy, 721900, Kyrgyz Republic.

  3. Kumtor Mine Site, located in the Kyrgyz Republic, approximately 350 kilometers to the southeast of the Kyrgyz capital of Bishkek and about 60 km to the north of the international boundary with the People's Republic of China, in the Tien Shan Mountains, at 41º 52' N and 78º 11' E.

## **Exhibit J**

Litigation

Pursuant to Local Rule 1007-2(a)(11), the following lists the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.

- The seizure of the Kumtor Mine under the Kyrgyzstan Republic's Temporary Management Law and ancillary orders.

- Judgment of the Oktyabrsky District Court of Bishkek of 7 May 2021 (case number ГД-1393/21.Б2) for environmental damages of KGS261,719,674,080 (approximately $3.08 billion) and a levy of KGS1,308,653,370.40 (approximately $15.45 million) in favor of the Government of the Kyrgyz Republic.

- Claim of 15 March 2021 for the enforcement of arrears of insurance contributions and penalties in the Oktyabrsky District Court of Bishkek in the amount of KGS2,105,751,318.5 (approximately $24.90 million).

- Decision of the Large Taxpayers Control Administration of Bishkek city and Chui province of 17 March 2021 (No. 08-3-10/1239) to cancel previous Decision (No. 1992/999 of 24 July 2018)  based on the Decision of the State Tax Service under the KR Government No. 11-12/3194, dated March 11, 2021, resulting in a KGS9,885,040,191.78 (approximately $123.56 million) claim against Kumtor Gold Company.

## **Exhibit K**

Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following lists the names of the individuals who comprise the Debtors' senior management at the time of the Expropriation Event, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.  Although the Debtors have not received any formal letters of resignation, upon information and belief the Debtors understand that certain individuals may have resigned and/or been purportedly terminated by the temporary external manager following the Expropriation Event.

| Name | Title | Duties | Responsibility and Experience |
|---|---|---|---|
| Deon Badenhorst | President | -Responsible for managing business operations and overseeing senior leaders. -Leads implementation of corporate policy and strategy and is primary liaison between the board of directors and management. | Deon Badenhorst first joined the Debtors in 2012 and is responsible for the operations of the Debtors. |
| Bolot Idirisov | Director, Operations | -Reports to the President of the Company. -Ascertain compliance with local legislation, international standards and Company policies -Ascertain Budget plan and targets set up by Corporate office are followed | Bolot Idirisov first joined the Debtors in 1995, and is responsible for all mine site functions and activities (safety, mining, milling, maintenance and etc.) |
| Anara Otogonova | Director, Environment, Social & Corporate Governance | -Reports to the President of the Company. -Ascertain compliance with local legislation, international standards and Company policies | Anara Otogonova first joined the Debtors in 2009, and is responsible for Environment, Social & Corporate Governance functions, and oversees the Debtors' Media and Legal functions. |

| Name | Title | Duties | Responsibility and Experience |
|---|---|---|---|
| Askar Oskombaev | Director, Government Relations | -Reports to the President of the Company.<br>-Leads relations with Government officials | Askar Oskombaev first joined the Debtors in April 2021, and is responsible for maintaining relations with all levels of Government officials |
| Simon Tan | Director, Finance | -Reports to the President of the Company.<br>-Ascertain compliance with local legislation, international standards and Company policies<br>-Ascertain financial report to Government, Shareholders and other stakeholders | Simon Tan first joined the Debtors in 2014, and is responsible for all financial activities |
| Aripin Buman | Director, Supply Chain and Logistics | -Reports to the President of the Company.<br>-Ascertain compliance with local legislation, international standards and Company policies with regards to procurement and logistics | Aripin Buman first joined the company in 2018, and is responsible for Supply Chain and Logistics activities |

## **Exhibit L**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' Employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the Petition Date.

| Payee | Payment (thousands of dollars) |
|---|---|
| Employees | $1,464 |
| Officers, Directors and Stockholders | $0 |
| Financial and Business Consultants | $0 |

## Exhibit M

Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

|  | Amount (thousands of dollars) |
|---|---|
| Cash receipts | $81,628 |
| Cash disbursements | ($53,523) |
| Net cash gain | $28,104 |
| Unpaid obligations | ($79,000) |
| Uncollected receivables | $29,058 |